UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:23-CR-229-JPB-RDC |
| | ) |
| CHARLES DUNN,<br>Defendant, | ) |

**POST HEARING BRIEF**

Mr. Dunn has filed a motion to suppress his custodial statements. (Doc. 524.) This Court should suppress Mr. Dunn's post arrest statements because 1) his *Miranda* waiver could not be voluntary due to the circumstances surrounding his arrest and waiver, 2) even if the Court finds that Mr. Dunn's statements to Officer Noe were voluntary, it should still suppress any statements made to Agent Hernandez because the character of the interrogation changed significantly, 3) Mr. Dunn's waiver could not be knowing and voluntary because officers' deception went directly to Mr. Dunn's rights and the consequences of waiving them.

## I. Hearing Testimony

On May 8, 2025, this Court held an evidentiary hearing on Mr. Dunn's motion. The following is a summary of the relevant testimony:

***Officer Gerald Dyar***

Fayette County Sheriff's Officer Gerald Dyar testified that he is assigned to

DEA Strike Force Group 2 and has been a full-time task force officer since 2006. Doc. 672 at 8. On July 11, 2023, Officer Dyar was one of two DEA agents in charge of a search being conducted at Mr. Dunn's residence, 100 Shady Brook Walk. Doc. 672 at 10. Officer Dyar did not complete any reports about the execution of the warrant, but he testified that "he was familiar with the reports." Doc. 672 at 24.

Officer Dyar testified that the search warrant was executed a little after 6:00 am. Doc. 672 at 10. Officers threw a flash bang device into the house before the SWAT teams entered. Doc. 672 at 31. Officer Dyar testified that the purpose of the flashbang device is to "disorient and disrupt the senses so that you comply." Doc. 672 at 32. Two SWAT teams with "probably 10 people" in each unit were then deployed into the residence. Doc. 672 at 12, 27. Two SWAT "BearCat" vehicles were used to secure the residence, as well as other marked and unmarked cars. Doc. 672 at 27. Fayette County emergency services also had an ambulance on scene. Doc. 672 at 12. All told, Officer Dyar estimated that there were "probably less than 50" officers on scene. Doc. 672 at 29. All of the officers were armed with either side arms or long guns and they were dressed in tactical gear with bulletproof vests. Doc. 672 at 29-30.

At the time officers entered the house, Mr. Dunn was in the master bedroom with another person. Both of them came out when they heard that the SWAT team

was going to breach the master bedroom door. Doc. 672 at 14. Mr. Dunn was handcuffed and removed from the residence immediately. Doc. 672 at 14.

Officer Dyar told Mr. Dunn that he had a "federal indictment warrant" and a search warrant, but he did not provide a copy of either to Mr. Dunn when he spoke with him after he was removed from the house. Doc. 672 at 16, 33. According to Officer Dyar when Mr. Dunn was told about the warrant, he "was fine with it." Doc. 672 at 16. However, Officer Dyar also testified that during that same time, Mr. Dunn "made a medical complaint saying he didn't feel well." Doc. 672 at 17. Mr. Dunn explained that his chest was hurting. Doc. 672 at 17. A SWAT team medic asked Mr. Dunn some medical questions and called for an EMT truck (which was already on scene) to come to the house. Doc. 672 at 17. Mr. Dunn was then taken back inside the house and placed in a chair for a medical evaluation. Doc. 672 at 17; 34. Officer Dyar documented Mr. Dunn in the chair with a photograph, but did not take any video. Doc. 672 at 36.

Officer Dyar received "medical paperwork" from the EMTs after they evaluated Mr. Dunn. Doc. 672 at 18. He testified that he was told that there were no medical issues that the EMTs observed. Doc. 672 at 19. Mr. Dunn was not transported by ambulance; he remained at the house. Doc. 672 at 19. Despite stating that Mr. Dunn was medically evaluated and cleared, Officer Dyar also testified that Mr. Dunn refused medical care at the time. Doc. 672 at 19. Officer

Dyar testified that Exhibit 5 was a medical refusal of care form signed by Mr. Dunn. Doc. 672 at 20. He testified that the form shows that medical treatment was advised and that "ambulance transport was advised," meaning "you should get in the ambulance and be transported." Doc. 672 at 36. *See also* Ex. 5 below:

**Fayette County Department of Fire and Emergency Services**

**Refusal of Care Information Sheet**

**Patient Advised** (CIRCLE APPROPRIATE RESPONSE)

Yes No Medical treatment/evaluation advised.
Yes No Ambulance transport advised.
Yes No Refused all EMS services.
Yes No Refused transport, accepted field treatment (SEE COMMENTS).
Yes No Refused treatment, accepted transport (SEE COMMENTS).

Pulse: 89
Resp: 18
B/P: 129/80
P-Ox: 97%
Other: ____:____

According to the form, Mr. Dunn refused transport, but accepted field treatment. *See* Ex. 5. Although the form suggested that follow-up comments would be listed below to explain the treatment, no comments were contained on the form. Doc. 672 at 37. Although Officer Dyar believed that Mr. Dunn received an EKG, he had no results from that exam or any documentation about it. Doc. 672 at 19, 37. Officer Dyar confirmed that while the EMTs were inside the residence with Mr. Dunn, SWAT team officers were still present at the residence. Doc. 672 at 49; see Ex. 1.

After Mr. Dunn spoke with the EMTs, "somebody came and got him and escorted him to the kitchen table where one of the agents was set up processing paperwork." Doc. 672 at 21. Officer Dyar testified that Mr. Dunn did not make any

statements to him other than medical complaints, but he remembers Mr. Dunn as "jovial." Doc. 672 at 21-22.

Officer Dyar was not present when Mr. Dunn was *Mirandized*. Doc. 672 at 22.

***Officer David Noe***

Officer David Noe testified that he works for the City of Doraville Police Department, but that he is assigned to the DEA Task Force. Doc. 672 at 50. He that he was involved in the investigation of Charles Dunn by reading line sheets from wiretaps, conducting surveillance, and handling warrants and arrests. Doc. 672 at 55. He was also assigned to Mr. Dunn's residence on the day of the execution of a search warrant, July 11, 2023. He was not part of the initial entry team, but he did observe Mr. Dunn while he was outside the residence. Doc. 672 at 58. Officer Noe testified that Mr. Dunn "started complaining of chest pains." Doc. 672 at 59. Officer Noe had "almost no interaction with" Mr. Dunn outside, but he did see him inside the residence later. Doc. 672 at 59.

Officer Noe was working on the inventory log for the search in the kitchen and Mr. Dunn was brought to the kitchen in handcuffs. Doc. 672 at 59, 60. He testified that it was his understanding that Mr. Dunn had received medical attention, but Officer Noe was not involved with it. Doc. 672 at 60. Officer Noe considered Mr. Dunn to be in custody. Doc. 672 at 60. Several officers were in and

out of the area as they processed items from the search and Officer Tenety was present at the table. Doc. 672 at 60. Officer Noe does not remember if he still had his ballistic vest on when he met Mr. Dunn. Doc. 672 at 60.

Officer Noe read Mr. Dunn his *Miranda* warnings using a DEA Form 13 card that he keeps in his wallet. *See* Ex. 6:



ORAL WARNING TO BE GIVEN TO A SUBJECT PRIOR TO INTERROGATION

Before we ask you any questions, you must understand:

- You have the right to remain silent.
- Anything you say can be used against you in court.
- You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.
- If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

Do you understand?

Are you willing to answer some questions?

DEA-13A (6/84)

Officer Noe testified that, at the end of the warnings, Mr. Dunn "acknowledged that he understood." Doc. 672 at 62. Officer Noe then testified that he then stated, "I'm not going to ask you any questions. This is not my investigation. I'm not going to ask you any questions except for personal information for me to put on paperwork." Doc. 672 at 62. Officer Noe testified that

Mr. Dunn did not appear confused and that he was "jocular." Doc. 672 at 62. According to Officer Noe, Mr. Dunn "was talking about this, that, and the other." Doc. 672 at 62. Officer Noe asked Mr. Dunn questions about his date of birth, social security number, address, phone numbers, next of kin, things like that" and Mr. Dunn answered. Doc. 672 at 63.

Officer Noe testified that someone brought two laptops to the table and asked Mr. Dunn for the passwords and he provided the passwords. Doc. 672 at 63. Someone wrote the passwords down and stuck them to a laptop. Doc. 672 at 63. When asked about the DEA 6 that he wrote commemorating this interview, Officer Noe admitted that the DEA 6 did not mention anyone requesting passwords from Mr. Dunn. Doc. 672 at 71.

Officer Noe testified that there is no video or audio recording of his interview with Mr. Dunn. Doc. 672 at 68. He was not present for any further questioning of Mr. Dunn. Doc. 672 at 65.

***Officer Marlyn Williams***

Officer Williams testified that he works for the Fayette County Sheriff's Office, Special Operations in charge of warrants. Doc. 672 at 73. He testified that on July 11, 2023 he transported a subject that had been arrested and detained from Fayette County to 75 Ted Turer Southwest. Doc. 672 at 74, 76. He does not recall anything about the person he picked up other than he was a black male. Doc. 672

at 75. He transported this male and another detained individual at the same time. Doc. 672 at 75. Officer Williams testified that he does not remember anything remarkable happened during the transport. Doc. 672 at 77. He also testified that he has no independent recollection of the day. Doc. 672 at 81.

Officer Williams testified that he was driving his Fayette County Sheriff's Department car that day and, at that time, all Fayette County Sheriff's vehicles had dash cameras and all officers wore body cameras. Despite this fact, he testified that on that day he was not wearing her body camera and his car did not have a dash camera. Doc. 672 at 80. He did not write a report about the transport he conducted that day. Doc. 672 at 81.

***Agent Bruce Hernandez***

Agent Hernandez testified that he works for the Drug Enforcement Administration as a special agent and he has done so since 2018. Doc. 672 at 82-83. Officer Hernandez testified that he was one of the primary case agents for the Charles Dunn investigation. Doc. 672 at 84. He testified that on the day Mr. Dunn was arrested, July 11, 2023, he was stationed at the courthouse conducting interviews. Doc. 672 at 84-85. He first encountered Mr. Dunn around 12 pm. Doc. 672 at 88. Mr. Dunn was sitting at a table with other agents, he was not restrained, and none of the agents were armed. Doc. 672 at 87. Agent Hernandez testified that he informed Mr. Dunn of his charges and asked if he was willing to cooperate and

talk to investigators, but he agreed that his report stated only that he asked Mr. Dunn if he wanted to speak "about the overall investigation." Doc. 672 at 112. According to Agent Hernandez, he also told Mr. Dunn that he was aware that Mr. Dunn had been read his *Miranda* rights previously. Doc. 672 at 88. However, the agent agreed that he did not include information about this discussion in his report. Doc. 672 at 110. Agent Hernandez testified that it was part of the plan that day for officers on the scene to read *Miranda* warnings to the defendants. Doc. 672 at 88.

Around 12:30 pm began to interview Mr. Dunn. Doc. 672 at 89. Agent Hernandez, another agent, and two analysts were present. Doc. 672 at 90. The room was normal-sized with a table and three or four chairs, and it was equipped with audio and video recording devices. Doc. 672 at 90.

Agent Hernandez did not advise Mr. Dunn of his *Miranda* rights before conducting the interview. He testified that he knew from talking to Officer Dyar that Mr. Dunn had been given his *Miranda* warnings that day. Doc. 672 at 98. He testified that he told Mr. Dunn he was required to ask if Mr. Dunn wanted the interview recorded and that and Mr. Dunn said he did not want to be recorded. Doc. 672 at 90. The interview lasted forty-five minutes to an hour. Doc. 672 at 90.

Agent Hernandez initially testified that he knew Mr. Dunn had received medical care earlier in the day, but he could not recall if Mr. Dunn referred to receiving prior medical attention during the interview. Doc. 672 at 94, 100. He

later testified that he does not recall anyone discussing the medical issue during the interview. Doc. 672 at 100.

Even though there was no recording of the interview, an analyst did take notes during the interview. Doc. 672 at 100. The analyst notes do not mention the claim that Mr. Dunn wanted to do an un-recorded interview with agents. Doc. 672 at 101. The notes do not mention anything about the agents telling Mr. Dunn he could choose not be recorded. Doc. 672 at 101.

Agent Hernandez confirmed that agents did not speak to Mr. Dunn about the case at the time of his arrest. Doc. 672 at 104.

**II. Mr. Dunn's Miranda waiver could not be knowing, voluntary, and intelligent due to the circumstances surrounding his arrest and waiver,**

Absent certain procedural safeguards, a statement given during custodial interrogation is presumed to be compelled in violation of the Constitution. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). To dispel that presumption of compulsion, the person in custody must be advised of certain rights. *Id.* The person in custody may then waive his rights, but to be operative the waiver must be made voluntarily, knowingly, and intelligently. *Id.* If the Government violates a person's right against compelled self-incrimination, then generally the compelled statements must be suppressed. *Missouri v. Seibert,* 542 U.S. 600, 608 (2004).

"When a defendant challenges the voluntariness of a confession, the

government must prove its voluntariness by a preponderance of the evidence in order for the confession to be admissible as substantive evidence at the defendant's criminal trial." *United States v. Bell,* 367 F.3d 452, 461 (5th Cir.2004) (citing *Arizona v. Fulminante,* 499 U.S. 279, 310 (1991)). In order to find [the defendant's] confession voluntary, a court must conclude that he made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the pressures and circumstances swirling around him. *Jurek v. Estelle,* 623 F.2d 929, 937 (5th Cir. 1980) *(en banc), cert. denied*, 450 U.S. 1001, 1014(1981).

In this case, Officer Noe *Mirandized* Mr. Dunn shortly after he was advised by EMTs that he should be transported to the hospital for an evaluation after he was complaining of chest pain. He was advised at this time because it was part of a plan that had been developed by officers the day before. The plan was to have an officer *Mirandize* Mr. Dunn after approximately 50 armed officers breached his front door at 6:00 am, threw a flash-bang device, and arrested all occupants of his house. Not surprisingly, Mr. Dunn had an elevated heart rate after officers stormed the house and he notified officers that he was not feeling well. At the time the *Miranda* warnings were delivered, Mr. Dunn did not have the capability to make a knowing and voluntary waiver of his rights due to his medical issues. Rather than forego the plan from the day before and allow Mr. Dunn to recover from the shock

of the morning, Officer Noe *Mirandized* Mr. Dunn and reassured him that "I'm not going to ask you any questions. This is not my investigation. I'm not going to ask you any questions except for personal information for me to put on paperwork." Doc. 672 at 62. Mr. Dunn then apparently agreed to answer his questions. Although video recordings were being made by officers outside and inside the home, no one recorded the *Miranda* warnings or any discussions Officer Noe had with Mr. Dunn. Officer Noe did not ask Mr. Dunn to sign a *Miranda* waiver form.

Given that Mr. Dunn was still in the throes of a medical episode at the time of the *Miranda* warnings, this Court should find that his apparent waiver could not be knowing, voluntary, and intelligent. Mr. Dunn was experiencing medical symptoms that caused the EMTs to advise that he should be transported to a hospital for evaluation. The whole purpose of the flashbang device was to "disorient and disrupt" Mr. Dunn's senses so that he would comply. *See* Doc. 672 at 32. There was no intervening event or break in the traumatic events of the morning before he was taken to see Officer Noe and read his rights. Additionally, Officer Noe assured Mr. Dunn that he was not going to ask him any questions because it was not his investigation. This assurance that he would not question Mr. Dunn about the case was meant to place Mr. Dunn at ease so that he felt comfortable answering biographical questions. The Court should not take Mr. Dunn's responses to Officer Noe as a knowing waiver of his rights given the

assurances provided by Officer Noe that he was "not going to ask you any questions. This is not my investigation." Doc. 672 at 62. It is clear Officer Noe did not honor that promise when he questioned Mr. Dunn about the password information for laptops found in the home and certainly Agent Hernandez did not feel bound by these representations when he questioned Mr. Dunn later in the day. Given the medical issues and the assurances provided by Officer Noe, this Court should find that Mr. Dunn did not have the capacity to make a knowing, voluntary, and intelligent waiver of his rights.

## III. Even if the Court finds that Mr. Dunn's statements to Officer Noe were voluntary, it should still suppress any statements made to Agent Hernandez because the character of the interrogation changed significantly.

Even if the Court finds that the *Miranda* warnings provided by Officer Noe were sufficient to render any contemporaneous statements knowing and voluntary, it should still suppress statements allegedly made to Agent Hernandez hours later.

Typically, *Miranda* warnings remain effective for subsequent questioning unless the circumstances change so seriously that the subject's answers are no longer voluntary, or unless he is no longer making a "knowing and intelligent relinquishment or abandonment" of his rights. *Wyrick v. Fields*, 459 U.S. 42, 47 (1982). "In making this assessment, the Court look[s] to whether the character of the interrogation had changed significantly, and whether the questions put to the defendant subsequently would have caused him to forget the rights of which he had

been advised and which he had previously understood." *See United States v. Little*, 119 F.4th 750, 773 (10th Cir. 2024), *citing Wyrick*, 459 U.S. at 47-49, 103 S.Ct. 394. Some courts have found that factors relevant to whether circumstances have sufficiently changed are "(1) the length of time between interrogations; (2) whether the defendant was in continuous custody; (3) and whether the focus of the interrogations remained the same." *Williams v. Lee*, 2019 WL 935958, at *7 n.5 (S.D.N.Y. Feb. 26, 2019).

Here, Mr. Dunn was told at the time of his *Miranda* warnings that the officer providing those warnings was not going to ask any questions other than biographical questions because it "wasn't his investigation." Mr. Dunn then apparently agreed to provide biographical data. Hours later, he was taken into a room by a different officer and asked questions of a very different nature. He was asked about the facts of the case including specific drug transactions; he was asked about other potential defendants in the case. He was not asked just about biographical information. Words or actions constitute interrogation when, from the standpoint of an objective officer, they "are reasonably likely to elicit an incriminating response from the suspect." *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Clearly the interaction with Agent Hernandez was meant to illicit incriminating responses from Mr. Dunn. The focus of the morning questioning was vastly different than the afternoon questioning; it

was designed to be. Officers designed a plan the day before Mr. Dunn was arrested to ensure that Mr. Dunn would be informed of his rights at the time that was most disorienting and confusing – right after a flashbang was deployed in his residence. Roughly 5-6 hours later, Agent Hernandez picked up the plan when he met Mr. Dunn in the booking area. He asked Mr. Dunn if wanted to speak "about the overall investigation" and Mr. Dunn allegedly agreed. Doc. 672 at 112. Although the interrogation room had video and audio recording equipment, the agent claimed that the interview was not recorded because Mr. Dunn requested that it not be recorded. Although Agent Hernandez claims that he mentioned the prior Miranda warning to Mr. Dunn, contemporaneous analyst notes do not mention the prior *Miranda* warnings or the alleged request not to record the meeting. Agent Hernandez report about the interrogation does not mention any discussion of *Miranda* warnings with Mr. Dunn.

The only warnings Mr. Dunn had been given were accompanied by assurances that only biographical questions would be asked. The nature of the afternoon interrogation warranted a new *Miranda* warning and it could have easily been provided, but because it was not part of the plan developed prior to Mr. Dunn's arrest, Agent Hernandez chose not to provide it. This Court should find that the questioning of Mr. Dunn without a subsequent *Miranda* warning warrants suppression.

**IV. Mr. Dunn's waiver could not be knowing and voluntary because officer deception went directly to Mr. Dunn's rights and the consequences of waiving them.**

The Eleventh Circuit recently explained that police deception renders a suspect's statement involuntary either (1) "where the deception took the form of a coercive threat" or (2) "where the deception goes directly to the nature of the suspect's rights and the consequences of waiving them." *United States v. Morgan*, 143 F.4th 1264 (11th Cir. 2025), *citing Farley*, 607 F.3d at 1328–29. The second type of deception is at issue here.

The *Morgan* court cited three relevant cases. In *United States v. Beale*, one of the defendants, who couldn't speak English or read his native Spanish, signed a *Miranda* waiver only "after the FBI agents told him [in Spanish] that signing the form would not hurt him." 921 F.2d 1412, 1434 (11th Cir. 1991). On appeal, the defendant argued that his *Miranda* waiver was involuntary—and the Eleventh Circuit agreed. The *Morgan* court explained that, "by telling [the defendant] that signing the waiver would not hurt him . . .the agents contradicted the *Miranda* warning that a defendant's statements can be used against the defendant in court, thereby misleading [him] concerning the consequences of relinquishing his right to remain silent." *Id.* at 1435; *cf. Miranda,* 384 U.S. at 479, 86 S.Ct. 1602 (holding that police must warn a suspect "that anything he says can be used against him in a court of law").

The *Morgan* court also cited *Hart v. Attorney General of the State of Florida*, 323 F.3d 884 (11th Cir. 2003). There, after one officer read the defendant his *Miranda* rights, the defendant asked another officer, whom "he trusted," "what were the pros and cons, in her opinion, of hiring a lawyer." *Id.* at 894. In response, she told him that one of the "disadvantage[s] of having a lawyer present was that the lawyer would tell [the defendant] not to answer incriminating questions." *Id.* During the same exchange, she also told the defendant "that 'honesty wouldn't hurt him.'" *Id.* The Eleventh Circuit held that the defendant's *Miranda* waiver was involuntary because the police had misinformed him about the legal effect of not one but two of his *Miranda* rights. The Court explained, "[t]he reason for requiring a lawyer during custodial interrogation is to protect a suspect;s privilege against self incrimination, yet, [the officer] in effect told [the defendant] that this was the disadvantage of having a lawyer." *Id.* And by "[t]elling him that 'honesty wouldn't hurt him,'" the officer had "contradicted the *Miranda* warning that anything he said could be used against him in court." *Hart*, 323 F.3d at 894 (footnote omitted).

The third case cited by *Morgan* is *Lall*, where an uncounseled 20-year-old confessed after an officer "explicitly assured [him] that anything he said would not be used to prosecute him" and that the defendant "would not be charged for any statements or evidence collected on the night of the robbery." 607 F.3d at 1287.

"Under these circumstances"—in which the officer's statement flatly contradicted *Miranda*'s guarantee—we held that the officer's "statements were sufficient to render [the defendant's] confession involuntary and to undermine completely the prophylactic effect of the *Miranda* warnings [the officer] previously administered." *Id.*

In this case, it is unclear if the questions asked by Officer Noe solicited information that prosecutors may attempt to use at trial. He stated that he asked about date of birth, social security number, address, phone numbers, next of kin, and things like that, but he also admitted that officers questioned Mr. Dunn about laptop passwords after he explicitly told Mr. Dunn that he was "not going to ask any questions except for personal information for me to put on paperwork."

Additionally, Officer Noe's repeated statements that he was not going to ask about the case came immediately after the ***only*** *Miranda* warnings that were provided to Mr. Dunn. The warnings and Officer Noe's statements were directly contradictory, like the examples provided in *Beale*, *Hart*, and *Lall* above. Officer Noe told Mr. Dunn he would not question him about the case but he also told him that anything he said could be used against him. These directly contradictory statements were confusing at best and purposely misleading at their worst. Hours later, Mr. Dunn met with Agent Hernandez with only the statements of Officer Noe having been offered. New warnings could have been provided to clarify that an

actual interrogation was beginning and that Mr. Dunn has certain rights pertaining to that interrogation. But such warnings were not part of the officers' plan and so they chose not to give them. Under the circumstances, Officer Noe's misleading statements rendered Mr. Dunn's subsequent confession involuntary and undermined the prophylactic effect of the *Miranda* warnings.

This Court should suppress Mr. Dunn's statements.

Respectfully submitted this 6th day of October 2025.

s/Saraliene S. Durrett
Saraliene Smith Durrett, LLC
1800 Peachtree Street, Suite 300
Atlanta, GA 30309
(404) 433-0855
ssd@defendingatl.com
Counsel for Defendant Dunn