IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>CHARLES DUNN, A/K/A SILK | Criminal Action No.<br><br>1:23-cr-229-JPB-RDC |

**United States' Opposition to Defendant Charles Dunn's Perfected Motion to Suppress Wire and Electronic Communications Evidence**

The United States of America, by Theodore S. Hertzberg, United States Attorney, and Dwayne A. Brown Jr. and John T. DeGenova, Assistant United States Attorneys for the Northern District of Georgia, files this response to Defendant Charles Dunn's perfected motion to suppress wire and electronic communications evidence seized pursuant to Title III intercept orders. (Doc. 719). For the reasons stated below, the Court should deny the Defendant's motion to suppress.

**INTRODUCTION**

The Defendant was a principal leader of a drug trafficking organization (DTO) that distributed kilogram quantities of cocaine and other drugs throughout several states. Once federal agents began investigating this DTO in 2022, their primary end goal was the dismantling of this DTO. Federal agents employed many, and considered other, investigative techniques, but these techniques proved unsuccessful in accomplishing the investigation's overall

goals. In February 2023, agents received this Court's approval to intercept the Defendant's and one of his drug supplier's phones. To authorize interception, federal agents detailed the Defendant's and his phones' many connections to drug activity and money laundering.

## FACTS

### 1. The Defendant is tied to Drug Trafficker Adan Macedo-Rios

In November 2022, DEA agents initiated a drug and money laundering investigation focused on Adan Macedo-Rios (Macedo), a Loganville, GA cocaine supplier, and the Defendant, a large-scale drug distributor and money launderer operating from the Atlanta area. (Exhibit A-- Feb. 17, 2023, Wire Intercept Affidavit at 12, 14). The Defendant, who went by the moniker "Silk," drove a white Cadillac Escalade. (Ex. A at 12, 38, 50). During this investigation, agents determined the Defendant used three phones, including phone number 404-452-2448 (TT#3), phone number 470-526-4638 (TT#4), and phone number 470-332-6483 (the 6483 number). (Ex. A at 7-8, 29). At the outset, DEA agents used multiple investigation techniques, including physical and electronic surveillance, analysis of phone and other records, and a confidential source.

After approximately three months, the DEA's investigation progressed to wiretaps on two of Macedo's phones and two of the Defendant's. On February 17, 2023, the Honorable Eleanor Ross, United States District Judge for the Northern District of Georgia, issued an order authorizing the wiretap interception of communications concerning drug trafficking and money laundering over four phones, two used by Macedo (TT#1 and TT#2) and two

2

used by the Defendant (TT#3 and TT#4). (Exhibit F -- Feb. 17, 2023, Wire Intercept Order). The United States's application for the wiretap order was supported by a 94-page affidavit by DEA Special Agent Bruce Hernandez. (Ex. A). The affidavit set forth Agent Hernandez's training and experience, 30 pages of facts supporting probable cause, an analysis of recent telephone records for each phone, and a 40-page explanation of the investigative procedures that had been tried or considered. (Ex. A at 2-5, 11-44).

The probable cause section included the following information. In October 2022, approximately one month before the investigation began, Macedo paid a confidential source roughly $100,000 to settle a drug debt owed to an international cocaine supplier. (Ex. A at 13). Macedo bragged to the confidential source that he distributed approximately 50 kilograms of cocaine per week and used multiple drug sources. (Ex. A at 13). The agents' investigation determined that Macedo frequented several drug and money stash locations. (Ex. A at 14). One of the suspected stash locations was a warehouse at 535 Milam Avenue, in south Atlanta, which was listed as the business address for Silk Logistics, a company the Defendant owned and had registered. (Ex. at 26). On several occasions, agents had surveilled Macedo visiting the Defendant's warehouse for brief, suspected drug transactions. (Ex. A at 26).

On December 12, 2022, Macedo traveled from his Gwinnett County home to the Defendant's warehouse. (Ex. A at 33). Before arriving there, Macedo and the Defendant had six phone calls. (Ex. A at 34). Macedo and the Defendant both used multiple phones that day, although the Defendant primarily used TT#3 (Ex.

A at 34). Based on the Affiant's knowledge, training, experience, and information from the investigation, the Affiant believed that Macedo and the Defendant met at the warehouse to further drug conspiracy (Ex. A at 34). Affiant reached this conclusion, in part, because on his experience with sophisticated drug traffickers known to be disciplined in their communications and known to routinely rotate phones to thwart law enforcement. (Ex. A at 34).

On December 14, 2022, right after receiving news about an outstanding drug debt, Macedo immediately called the Defendant. Specifically, the confidential source had been instructed by a Mexico-based supplier to contact Macedo to collect on an unpaid cocaine debt. (Ex. A at 35). Working with agents, the confidential source called Macedo about the $60,000 drug debt owed to the supplier. (Ex. A at 35). Macedo explained to the confidential source that he did not have the money but would contact his drug associate to obtain the funds. (Ex. A at 36). Less than a minute later, Macedo's first call was to Defendant's TT#3. (Ex. A at 36). The affidavit stated that the Affiant believed Macedo contacted the Defendant to obtain drug proceeds to pay the debt. (Ex. A at 37).

In January 2023, Macedo met drug couriers at the Defendant's warehouse to further their drug conspiracy. Specifically, on January 15, Macedo and a suspected drug courier arrived separately at the Defendant's warehouse. (Ex. A at 26-27). After a brief meeting there, they traveled in tandem to an Atlanta drug stash house, operated by co-conspirator Royce Cobb. (Ex. A at 27-29). When they arrived, Macedo carried a bag from the courier's vehicle into Highwood Drive. (Ex. A at 26-28). Based on the Affiant's training, experience, and information

4

from the investigation, Affiant believed Macedo and the courier retrieved drugs from the Defendant's warehouse to Cobb's drug stash house. (Ex. A at 28-29). Similarly, on January 25, 2023, Macedo again drove to the warehouse and called the Defendant before and when he arrived. (*Id.* at 29-30). Macedo met with a conspirator, the same one he met a few days earlier, and left the location after another short, clandestine meeting. (*Id.* at 30). This same pattern occurred again on February 3, 2023, when Macedo communicated with the Defendant immediately before arriving at the warehouse and conducting another covert meeting with a conspirator. (*Id.* at 35 n.16). Agents never identified any legitimate purpose for Macedo's visits to Silk Logistics. (*Id.* at 35).

## 2. The affidavit detailed evidence showing The Defendant used TT#4 to communicate with a courier about transporting cocaine to an Ohio customer.

In September 2022, Kentucky State Police traffic stopped Tyshaun Mobley as she traveled north on the interstate in Kentucky. (Ex. A at 37). Officers searched Mobley's vehicle and found six kilograms of cocaine. (Ex. A at 37). Officers Mirandized Mobley, and she admitted to working as drug and money courier based in Atlanta. (Ex. A at 37). She admitted to receiving the cocaine from her supplier, whom she identified as "Skill," that day in Atlanta before leaving to deliver the drugs to Ohio. (*Id.*). Mobley stated she had made approximately ten trips from Atlanta to Tennessee and Ohio to deliver drugs and obtain drug proceeds for her supplier, who paid her for transporting the drugs and money. (Ex. A at 37). Mobley described "Skill" as a black man from Atlanta who drove a

white escalade, which was the same type of vehicle the Defendant used. (Ex. A at 36-38). Mobley provided a number for "Skill" as (255)-953-9892 (the 9892 number), which agents later believed was a false number for her source, which she gave to minimize her role and foil law enforcement. (Ex. A at 38).

Mobley admitted that she had been instructed to call one of the customers, Timothy Woods, when she arrived in Ohio. (Ex. A at 38). With the officers present, Mobley called Woods to say she was still enroute. (*Id*.). Woods responded, "did you call big bro back, because he was worried." (*Id*.). Based on the investigation, including information learned later, Affiant believed Woods asked Mobley if she had contacted the Defendant ("big bro") as he was worried about the cocaine destined for Ohio. (Ex. A at 39). Next, officers instructed Mobley to call her Atlanta source. As directed at 5:38 pm, Mobley called her Atlanta source at TT#4—the Defendant's number. (*Id*.). But the Defendant did not answer. (*Id*). Beyond that missed call, toll records show the Defendant and Mobley communicated with each other several times that day.

### a. Phone toll records showed regular contact between the Defendant, using TT#4, and Mobley the day of the traffic stop.

Phone records show that on the September 28, 2022, (the day of Mobley's traffic stop), she and the Defendant, using TT#4, were in contact throughout the day, including before and after the traffic stop. (Ex. A at 40-42). A two-minute call communication at 9:24 a.m., was consistent with the time Mobley said she left Atlanta with the cocaine. (*Id.* at 40). Later in the day, the Defendant called Mobley seven more times as shown below:

6

1. Outgoing call from TT#4 to Mobley at 4:10 pm

2. Outgoing call from TT#4 to Mobley at 4:10 pm (again)

3. Outgoing call from TT#4 to Mobley at 4:11 pm

4. Outgoing call from TT#4 to Mobley at 4:15 pm

5. Outgoing call from TT#4 to Mobley at 4:15 pm (again)

6. Outgoing call from TT#4 to Mobley at 5:20 pm

7. Outgoing call from TT#4 to Mobley at 5:21 pm

(Ex. A at 40-41). Affiant believed the toll records above were consistent with the Defendant trying to contact Mobley several times because he was concerned about the cocaine she possessed. (Ex. A at 40). Based on Mobley's statements to law enforcement, the kilogram seizure of cocaine, and the toll records showing the Defendant calling Mobley several times, agents believed the Defendant used TT#4 to facilitate narcotics trafficking. (Ex. A at 41-42).

### 3. The affidavit's detailed phone toll analysis showed the conspirators' use of phones during the investigation.

The affidavit explained how federal agents analyzed phone tolls to identify new and replacement phones for Macedo and the Defendant as they regularly swapped phones. (Ex. A at 32). For instance, the Defendant's 6483 number was a frequent contact of one of Macedo's phones, with approximately 559 contacts between October and early November 2022. (Ex. A at 30 n.14). The affidavit explained how agents connected the phones to the Defendant, for instance by detailing that the 6483 number and TT#4 were subscribed to the same name and address and had been activated the same day. (*Id.* at 44). The 6483 number was

also a frequent contact of Woods's phone number and Macedo's TT#2. (*Id.* at 42-43). The analysis showed that the Defendant used TT#3 to communicate with Macedo (over multiple phones) and Woods. (*Id.* at 18, 32, 44). Even after Mobley's traffic stop, toll records showed that she and the Defendant were frequently in contact in January and February 2023 over TT#4. (*Id.* at 44).

In sum, the affidavit showed that the Defendant continually used his cell phones to communicate with three categories of people: his suppliers, like Macedo, to arrange meetings; his couriers, like Mobley, to conduct drug and money exchanges; and his drug customers, like Woods, to discuss transactions. (*See, generally,* Ex. A 33-44). Based on his regular communications with Macedo and Mobley, including before and during drug transactions, surveillance of conspirators at the Defendant's warehouse, and the seizure of six kilograms of cocaine from the Defendant's courier, agents believed the Defendant used TT#3 and TT#4 (and other phones), to facilitate narcotics trafficking. (Ex. A at 33, 42).

**4. The affidavit summarized the Defendant's history of similar drug trafficking and money laundering conduct.**

The affidavit summarized the Defendant's May 2021 arrest by the DEA for drug trafficking after seizing kilograms quantities of cocaine and fentanyl from a Hapeville, Georgia apartment. (Ex. A at 14). Agents had agreed to release the Defendant in exchange for his agreement to cooperate, but he failed to follow through. (Ex. A at 14). Prior to that arrest, the Defendant twice delivered bulk cash to the DEA during money laundering investigations. (Ex. A at 49). Specifically, in January 2021, the Defendant met an undercover DEA agent at a

restaurant in Atlanta and delivered approximately $80,000 in drug proceeds to the undercover agent. (Ex. A at 59). Similarly, in April 2021, the Defendant met another undercover DEA agent at a retail store and delivered $100,000 in drug proceeds to the undercover agent. (Ex. A at 60). During the meeting, the Defendant expressed his displeasure with cocaine prices and claimed to possess multiple kilograms of cocaine. (Ex. A at 60). Following these two meetings, trained narcotics canine alerted to the presence of narcotics on the cash. (Ex. A at 61). Additionally, the Defendant was convicted in Ohio in 1993 for cocaine distribution and carrying on a continuing criminal enterprise, where he was sentenced to 30 years in federal prison. (Ex. A at 14 n. 6).

## ARGUMENT & AUTHORITY

The Defendant's motion should be denied as the wiretap pleadings complied with all requirements for lawful interception. *First*, the affidavit established sufficient probable cause to intercept the Defendant's phones. The affidavit described the Defendant's connections to other drug traffickers and how he engaged in drug trafficking. The affidavit also established a nexus between his phones and the illegal activity. Because probable cause was corroborated (and not contradicted) by supporting documents, like cell phone records and police reports, the Defendant cannot meet his burden for a *Franks* hearing. *Second*, the affidavit established a need for intercepting the Defendant's phones considering the goals of the investigation—which included the dismantling of this DTO. Specifically, the affidavit detailed the success and failures of each investigative technique or otherwise explained why a particular investigative tool was

insufficient to accomplish the investigation's goals. *Last*, the Government complied with the technical requirements to intercept the Defendant's phones. Specifically, the United States' application was signed by a proper approving official at the Department of Justice. Similarly, once wiretap recordings ceased, the Government **immediately** sealed the recordings as directed.

1. **The Affidavit established probable cause for the interception of communications over the Defendant's phones (TT#3 and TT#4).**

In April 2025, in response to a suppression motion filed by a co-defendant, this Court found that the February 17, 2023, wiretap order established probable cause to intercept one of the Defendant's phones, TT#4. (see Doc. 633). The Defendant's arguments here do not change that analysis. Section 2518(3) of Title III requires that a wiretap order be supported by probable cause to believe that (1) an individual is committing, or has committed, or is about to commit an offense enumerated in 18 U.S.C. § 2516, (2) particular communications concerning that offense will be obtained through the use of the wiretap, and (3) the telephone to be intercepted is being used in connection with the commission of such offense. 18 U.S.C. § 2518(3); *see also United States v. Goldstein*, 989 F.3d 1178, 1193 (11th Cir. 2021) ("The Government can establish probable cause for a wiretap with facts showing that (1) a crime is being, has been, or is about to be committed and (2) communications about the crime will be intercepted by the requested wiretap.") (citing 18 U.S.C. § 2518(3)(a)-(b)). "An application for a wiretap authorization must be supported by the same probable cause necessary for a search warrant." *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990). To

establish probable cause, the record must demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Miller*, 24 F.3d 1357, 1361 (11th Cir. 1994) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Courts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the warrant process and a high level of deference to the issuing court. *United States v Miller*, 24 F. 3d 1357, 1361 (1994). The reviewing court's task is "simply to ensure that the [judge] had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Nixon*, 918 F.2d at 900 (quoting *Gates*, 462 U.S. at 238). Indeed, in the wiretap context, "the practical nature" of evaluating probable cause "justifies great deference upon review and calls for upholding the [judge's] findings even in marginal or doubtful cases." *Nixon*, 918 F.2d at 900 (internal citations and quotations omitted). If the reviewing court decides the facts set forth in the application and affidavit "were minimally adequate to support the determination" of probable cause, the review is done, and the affidavit stands. *United States v. Diaz*, 176 F.3d 52, 109 (2d Cir. 1997).

Finally, a wiretap order, like a search warrant, is presumed valid, placing the burden of persuasion to establish its invalidity firmly upon the defendant. *United States v. Mitchell*, 274 F.3d 1307, 1310-11 (10th Cir. 2001) ("a wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this

presumption"); *see also United States v. Bercoon*, case no. 1:15-cr-022-LMM-JFK, 2016WL11717711, at *11 (N.D. Ga. Aug. 31, 2016) (same).

In the instant case, the February 2023 wire affidavit firmly established probable cause that the Defendant and other conspirators had engaged in, and were actively engaged in, drug trafficking and that communications about that illegal activity would be intercepted over both TT#3 and TT#4. The affidavit described (1) the Affiant's extensive training and experience working narcotics investigations; (2) the Defendant's involvement with the six kilograms of cocaine seized from Mobley; (3) meetings and calls between the Defendant and Macedo at the Defendant's warehouse; and (4) the toll records which showed the Defendant's frequent communication with high-level drug traffickers, drug couriers, and drug customers.

*First*, the Affiant, DEA Special Agent Bruce Hernandez, set forth his nearly twelve years of training and experience working on drug investigations, including three years assigned to the narcotics section of a Florida Police Department, four years as a DEA Task Force Officer in Tampa, Florida, and nearly five years as a DEA Special Agent. (Ex. A at 2-4). In addition to months of formal training by the DEA (including several courses in telecommunications interception and exploitation), the Affiant also discussed numerous opportunities for on-the-job training through participation in wiretap investigations, interviewing "scores" of drug traffickers and witnesses, analyzing drug traffickers' telephone billing records, and studying their patterns and practices. (Ex. A at 2-4). Agent Hernandez explained how he knew that drug

traffickers often used multiple cellular phones and compartmentalized their communications to avoid detection by law enforcement. (Ex. A at 3). He also explained that interpretations of conversations in the affidavit were based on the investigation to date, "as well as on [his] training and experience as a DEA agent." (Ex. A at 12).

*Second*, the affidavit established that while Mobley transported six kilograms of cocaine from Georgia to Ohio, she was in regular contact with the Defendant's TT#4 before, during, and after law enforcement seized cocaine from her vehicle. When she was traffic stopped with the cocaine, Mobley told officers that she was transporting cocaine for her supplier in Atlanta, named "Skill." Tellingly, Mobley's description of "Skill," a similar name to Defendant's moniker Silk, matched agents' knowledge of the Defendant. Mobley admitted to making ten out of state trips, for her Atlanta source, to deliver drugs and pick up drug proceeds. (Ex. A at 36-37). Mobley ultimately provided the Defendant's TT#4 to officers as the contact number for her Atlanta supplier, though she initially provided another number. (Ex. A at 38-39).

Toll records corroborate Mobley's account. The records show that on September 28, 2022, the Defendant's TT#4 called Mobley in the morning (when Mobley said she received the cocaine in Atlanta) and then later called Mobley approximately seven times while she was detained by law enforcement. (Ex. A at 40-41). At agents' direction, Mobley called the Defendant's customer, Woods, who asked if Mobley called "big bro back, because he was worried" and that he wanted to make sure she was good. (Ex. A at 38-39). The affidavit explained why

13

the affiant reasonably believed "big bro" was the Defendant, based on the telephone toll records and context, who was concerned about his cocaine shipment. (*Id.* at 38-41). Afterwards, agents instructed Mobley to call her Atlanta source, and she called the Defendant's TT#4 though the call went unanswered. (Ex. A at 39). Predictably, and as discussed below, each of these calls are supported by the toll records. Based on the foregoing, Affiant believed the Defendant used TT#4 to facilitate this narcotics trafficking. (Ex. A at 41-42).[1]

*Third*, the affidavit explained that the Defendant and Macedo were engaged in a high-level drug trafficking operation in the Atlanta area. (*See id.* at 12-30). The DTO regularly met at the Defendant's warehouse to further the drug conspiracy. On December 12, 2022, the Defendant, using TT#3, and Macedo, using TT#1, communicated with each other several times to coordinate a meeting at the Defendant's warehouse. (Ex. A at 33-35). The affidavit discussed Macedo's pattern of visiting the Defendant's warehouse for brief periods and meeting suspected drug couriers there. Specifically, the affidavit detailed three occasions (on January 15 and 25, and February 3, 2023) where Macedo used the Defendant's warehouse for suspected drug transactions. (Ex. A at 26-27, 29-31, 35 n.16). On the latter two dates, Macedo contacted the Defendant's third phone before he arrived at the Defendant's warehouse. (Ex. A at 29, 35 n.16). Notably,

---

[1] The affidavit erroneously referred to The Defendant being in contact with "*Woods* before, during, and following the traffic stop" (emphasis added), though the toll records set forth in the affidavit clearly reflect that these communications were with Mobley.

agents never identified any legitimate purpose for Macedo's visits to the Defendant's warehouse. (Ex. A at 34-35).

The affidavit explained how Macedo called the Defendant immediately after he learned of an urgent drug debt. Particularly, in December 2022, Macedo received a phone call regarding an outstanding drug debt of $60,000. (Ex. A at 35). Macedo explained to the caller that he did not have the money, but he would contact his drug associate to collect the money. (Ex. A at 36). Macedo's TT#1 then immediately called the Defendant's TT#3. (Ex. A at 35). Based on these facts, Affiant believed Macedo called the Defendant's TT#3 to collect the drug debt. (Ex. A. at 36-37).

*Lastly*, toll records throughout the affidavit showed the consistent—and recent—communications between the Defendant and his conspirators, including over TT#3 and TT#4. (*Id.* at 18, 43-44). The Affidavit's Toll Analysis Section listed recent communications between the Defendant and his conspirators immediately before wire approval. (Ex. A at 42-44). These communications support the conclusion that drug trafficking conversations would be intercepted over TT#3 and TT#4. *See United States v. Degaule*, 797 F. Supp. 2d 1332, 1354-57 (N.D. Ga. 2011) (concluding that issuing judges had substantial basis for probable cause where affidavit detailed continuing criminal conduct and toll records showing that defendant remained in contact with conspirator).[2]

---

[2] The Defendant's motion, while ignoring multiple facts in the Affidavit, includes misleading claims in an effort to disprove the nexus between his phones and drug trafficking. (*See* Doc. 719 at 20). For instance, the motion points to the facts that the agents' analysis showed Macedo's TT#2 communicated with the

As in *Degaule*, this affidavit portrayed continuing criminal conduct, not an isolated drug deal, and supplied toll record evidence that the conspirators remained in contact, including over TT#3 and TT#4. In sum, the affidavit demonstrated consistent communication between the Defendant's phones (TT#3 and TT#4) and other drug traffickers and couriers, which communications persisted until days before wire approval. Accordingly probable cause was sufficiently outlined to support interception over TT#3 and TT#4.

**A. The Affidavit established probable cause to intercept the Defendant's phones independent of the probable cause for Macedo's phones.**

As discussed above, the affidavit firmly established the Defendant's and others' participation in drug trafficking and his use of TT#3 and TT#4 to facilitate that drug trafficking. The Defendant argues that the affidavit does not separately establish probable cause to intercept the Defendant's phones without

---

Defendant's TT#3 on two occasions between February 8-12, 2023. (*Id.*). This is misleading. Not only does this wholly ignore the recent contacts between TT#3 and Woods set forth in the Toll Analysis section (Ex. A. at 44), but it also ignores that TT#3 had been in frequent contact with Macedo's other phone, TT#1**,** during this period. (Ex. A at 18 (citing 12 contacts between TT#1 and TT#3 on February 7, 2023, approximately 10 days before wire approval).

Similarly, the Defendant's motion disregards TT#4's contacts with Mobley and summarily states that the affidavit "does not allege that TT#4 was in communication with Mr. Woods." (Doc. 719 at 20). Again, this misses the point. The affidavit explained how Agent Hernandez had insight into suspected drug traffickers' practices of frequently changing and using multiple phones. (Ex. A at 4). And, again it ignores how the Defendant was in contact on two other phones: TT#3 and the 6483 number. (*Id.* at 43-44).

undue reliance on Macedo's drug trafficking. Not only is this claim unfounded, but it is also misguided. There was ample evidence for the Court to find probable cause that communications concerning drug trafficking activity would be obtained through interception over TT#3 and TT#4. The Defendant and Macedo regularly communicated and were distributing drugs together. As such, the probable cause was intertwined. Agents were under no obligation to submit separate applications and somehow ignore the evidence and records connecting the Defendant and Macedo.

Regardless, the relevant probable cause inquiry is not whether the Defendant was necessarily engaged in criminal activity but "whether *an individual* was engaged in criminal activity and whether the conversations sought to be monitored over the target telephones were likely to contain evidence of a crime." *Degaule*, 797 F. Supp 2d at 1355 (emphasis in original, internal citations omitted); *see also* 18 U.S.C. § 2518(a)(3)(a)-(b) (requiring judge issuing wiretap order to determine "there is probable cause for belief that an individual is committed, has committed, or is about to commit a particular offense [and] there is probable cause for belief that particular communications concerning that offense will be obtained through such interception"). Given that the Defendant was in frequent and regular contact with Macedo (as well as Mobley and Woods), who was certainly engaged in drug trafficking, the Court could reasonably find probable cause to conclude that communications about drug trafficking would be intercepted over the Defendant's phones. Indeed, Macedo and the Defendant communicated over 500 times in the two months leading up to wire approval.

Ten days before the wire was approved, the Defendant and Macedo communicated approximately 12 times—both using phones that were later intercepted. (Ex. A at 18). Nonetheless, without citing any law, the Defense claims that the Defendant and Macedo's affidavits were improperly lumped together to obtain probable cause. The Defendant bears the burden of persuasion to establish the wiretap's invalidity. He fails to carry his burden.

**B. The Affidavit's probable cause was timely.**

The affidavit detailed an ongoing drug enterprise by the Defendant that started in 2021 and continued until his arrest. Accordingly, the information contained in the affidavit is not subject to staleness. It is fundamental that the information provided to a judge in the application for a wiretap order, just as for a search warrant, must be timely. *United States v. Batiste*, No. 06-20373-CR, 2007 WL 2412837, at *17 (S.D. Fla. Aug. 21, 2007) but "[t]here is no mathematical measure for when freshness fades away and staleness sets in," *United States v. Lopez*, 649 F.3d 1222, 1246 (11th Cir. 2011) (citations omitted). "Whether information submitted in support of a wiretap order is stale is an issue that is decided on the peculiar facts of each case." *Batiste*, 2007 WL 2412837, at *17. "Courts traditionally allow a fairly long period of time to elapse between information and search warrant in cases where the evidence shows a long-standing, on-going pattern of criminal activity." *Id.* (citation omitted); *see also United States v. Grant*, 521 F. App'x 841, 845 (11th Cir. 2013) (unpublished) (citation omitted) (explaining that "when criminal activity is 'protracted and continuous,' it is more likely that passage of time will not dissipate probable

18

cause" and "it is reasonable to assume that the activity has continued beyond last dates mentioned and may still be continuing"). "This is even more reasonable in wiretap cases than in ordinary search warrant cases, because no tangible objects that can be quickly carried off are sought." *Batiste*, 2007 WL 2412837, at *17 (citations omitted). Furthermore, "[i]t is well established ... that stale information is not fatal when ... updated information corroborates the alleged stale information." *United States v. Brandt*, No. 3:23-CR-00018-LMM-RGV, 2025 WL 1833186, at *23 (N.D. Ga. June 13, 2025).

Here, the affidavit described ongoing drug activity by the Defendant and the DTO leading up to wire approval in February 2023. Particularly, days before wire approval, the Defendant's phones were communicating with known drug traffickers—including Macedo, Mobley, and Woods. The affidavit detailed how over several months the Defendant and his conspirators met at the Defendant's warehouse to conduct suspected drug transactions. Of course, the affidavit also discussed the Defendant's drug trafficking and money laundering activities which occurred in 2021—less than two years before the wire approval. However, this activity was part of the Defendant's ongoing drug activity that continued into the next couple years. Because the older information was corroborated by the Defendant's more recent drug trafficking activity, the older information was helpful, not harmful, to the probable cause analysis.[3]

---

[3] The Defendant's motion essentially asks the Court to disregard all of these facts as unreliable because his counsel is apparently unsatisfied with copies of reports and the search warrant provided to explain who the Defendant was working with or whether others were arrested or convicted. (*See* Doc. 719 at 16-

## 2. The Defendant is not entitled to a *Franks* Hearing.

The Defendant requests a *Franks* hearing based on claims that the affidavit conflicts with the evidence and is misleading and unsubstantiated. These claims are without merit. To be entitled to a *Franks* hearing, a defendant must make a substantial preliminary showing that a false statement knowingly and intentionally or with reckless disregard for the truth was included by the Affiant in the affidavit, and the particular statement was necessary to the finding of probable cause. *United States v. Goldstein*, 989 F.3d 1178 (11th Cir. 2021). Neither negligent mistakes nor immaterial omissions raise a *Franks* issue. *Id.*. "There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *United States v. Aguirre-Benitez*, 2017 WL 9477737, at *11 (N.D. Ga. Apr. 24, 2017), *report and recommendation adopted*, No. 3:16-CR-9 -TCB, 2017 WL 2274621 (N.D. Ga. May 25, 2017). If a wiretap order would be supported by probable cause even after setting aside the alleged misrepresentations or considering the information allegedly omitted, no hearing is required. *See United States v. Sarras*, 575 F.3d 1191, 1218 (11th Cir. 2009). The Defendant cannot meet his burden here.

The Defendant seeks a *Franks* hearing based on three claims—all of which should be denied. First, the Defendant alleges the affidavit misled the reviewing

---

20). But the Defendant does not offer anything to controvert any of the facts stated in the Affidavit to meet his burden of establishing its invalidity. Moreover, the Defendant's argument improperly seeks to have the Court go far beyond its task of ensuring the issuing judge had a substantial basis for finding probable cause. *See Nixon*, 918 F.2d at 900.

court concerning two events: (1) by opining that a December 2022 meeting between the Defendant and Macedo, at the Defendant's warehouse, was in furtherance of the drug conspiracy, and (2) by asserting that Mobley initially provided a fake number for her drug source. (Doc. 719 at 7-12). But it is unclear how the Affiant's statements about his beliefs were at all misleading. The Affiant's opinions were based on his training and experience, his surveillance of the DTO, his knowledge of the Defendant, Macedo, Mobley and other DTO members, and available records. For instance, Mobley never communicated with the fake number she initially provided to the police.

Second, the Defendant claims the affidavit's probable cause section conflicts with the evidence concerning Defendant's calls to Mobley before, during, and after the traffic stop. (Doc. 719 at 12-14). Contrary to the Defendant's arguments, both Mobley's and the Defendant's toll records confirm that these calls occurred.

Third, the Defendant claims the affidavit's reference to the Defendant's involvement in two, 2021 money laundering transactions justify a *Franks* hearing. (Doc. 719 at 14-15). However, on this point, the Defendant fails to even allege that the affidavit contained false information (either intentionally or recklessly) concerning these transactions. Therefore, this claim should be summarily dismissed.[4] In short, and as discussed below, none of the Defendant's claims merit a *Franks* hearing.

---

[4] The Defendant does not attempt to explain how these statements were false. As discussed above, the motion seems to simply ask the Court to disregard the facts in the Affidavit because reports and a search warrant produced in discovery do not answer questions raised in the Defendant's motion. This misconstrues the

**A. Information contained in the Affidavit was true and not "misleading."**

The Affidavit's well-grounded conclusions were supported by the evidence and the Affiant's knowledge and experience. Yet, the Defendant claims these conclusions were misleading, apparently because he disagrees with them.

> **1. The Affiant reasonably concluded that the Defendant and Macedo met at the Defendant's warehouse to further the drug conspiracy.**

Although the Defendant asserts that the Affiant's conclusion was "conclusory" and unsupported by evidence of an actual meeting (Doc. 719 at 7-8), the Affidavit detailed the supporting evidence. As discussed above, the Affidavit detailed agents' surveillance of Macedo on December 12 traveling from his home to the Defendant's warehouse, the phone records showing contacts between the two individuals over multiple phones, Macedo's pattern of traveling to the warehouse to meet with suspected drug couriers, and the lack of any apparent legitimate purpose for these visits (Ex. A at 33-35). In light of the Affiant's knowledge, training, and experience with the investigation and the operations of drug traffickers, the Affiant reasonably concluded the meeting was to further the drug conspiracy. *See United States v. Leach*, 498 F. App'x 915, 918 (11th Cir. 2012) (citing *United States v. Robinson*, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) ("Opinions and conclusions of experienced agents regarding a set of facts are a factor in the probable cause equation."); *see also United States v. Acosta,* 807 F. Supp. 2d 1154, 1217-18 (N.D. Ga. 2011) (collecting circuit court decisions

---

Defendant's burden of making a substantial preliminary showing of knowingly and intentional false statements.

upholding warrants that rely on "agent's opinions based on his training and experience to establish a nexus between illegal drug activity and the items to be seized" and applying to issuing magistrate judge's conclusion that was "supported by the affiant's opinion, based on her training and experience"). Yet the Defendant does not offer or point to any evidence to explain how the Affiant's conclusion was somehow "misleading."

### 2. The Affiant reasonably concluded Mobley initially provided a fake number for her Atlanta source, the Defendant.

Given that Mobley ultimately called the Defendant's TT#4 as the number for her source and in light of the Affiant's experience, the affidavit stated that agents believed Mobley initially provided a false phone number ending in 9892 as her drug supplier's to minimize her role and foil law enforcement. (Ex. A at 38).[5] This belief was supported by the evidence. As discussed herein, the affidavit explained that the call records show multiple contacts that day between TT#4 and Mobley's phone, including those corresponding to the timeline of the day's events. (Ex. A at 37-41).

Undeterred by the facts, the Defendant's motion relies on information contained (or rather not contained) in notes and reports from the Kentucky officers to support a claim that the Affiant somehow knowingly and intentionally, or with reckless disregard provided false information regarding

---

[5] Tellingly, this is corroborated by the actual call records. Mobley had never called or received a call from the 9892 number, that day or ever. (*See generally* Exhibit B—Tyshaun Mobley's Call Detail Records).

the belief statement that Mobley provided a false number for her source. (*See* Doc. 719 at 8-12). The Defendant's argument focuses on three points: 1) the absence of the Defendant's name or phone number (TT#4) in the Kentucky officers' investigative reports; 2) an alleged omission that Kentucky officers obtained phone records for the numbers Mobley provided; and 3) alleged discrepancies or omissions between the affidavit and the Kentucky officers' notes regarding controlled calls Mobley made. (*See* Doc. 719 at 8-12).  As shown below, these are nothing more than red herrings.

First, although the Kentucky officer's notes may not include the Defendant's name or TT#4, the documents are consistent with the information in the Affidavit. (*See* Exhibit C (mentioning "Skill," described as a black male who drove an Escalade, and including the 9892 number). Second, the Defendant claims that the Affiant omitted the fact that the Kentucky officers obtained phone records for numbers provided by Mobley, including the 9892 number, but not "any data related to a phone number belonging to Charles Dunn, which suggests this number was not provided to them." (Doc. 719 at 9-10).[6] But this does not contradict anything in the Affidavit, including the allegedly misleading opinion that Mobley provided a false number for her supplier. The affidavit states that Mobley, during her interview, provided the 9892 number for "Skill" (Ex. A at 37-38) and that afterwards, when instructed to contact her Atlanta source, Mobley contacted TT#4, and "provided this number from her cellphone before the call"

---

[6] As discussed below, the Defendant's claim that Mobley's phone and TT#4 were not in contact, including during her traffic stop, is demonstrably false.

(*Id.* at 39). The Affidavit made no claims about what the Kentucky officers did or did not investigate.

As to the Defendant's third point, the Defendant claims that the affidavit omitted four, attempted controlled calls to "an individual in Georgia". (Doc. 719 at 10-12). As to these four, attempted calls, neither the Kentucky reports nor the recordings provide any indication of the person's name or phone number. Further, the recordings do not confirm Mobley connected with anyone during. In other words, they are entirely consistent with the Affidavit. The Affidavit and the toll records show calls to Woods at 5:35 p.m. and to TT#4 three minutes later (Exhibit B at 179). The unsigned Kentucky report does not mention Mobley's call to TT#4. (Doc. 719-2). Nevertheless, we know Mobley called TT#4 based on the toll records which showed a call the call to TT#4 at 5:38 pm. At bottom, the fact that the Affidavit lists a call that is not reflected on the unsigned supplemental Kentucky report is not an indication of a material omission. Notably, the Defendant has not shown that the Affidavit and the supplemental report are inconsistent. According to the supplemental report, Mobley claimed she could not call an individual in Georgia because she "didn't have a signal" and because the phone didn't ring. (Doc. 719-2). The affidavit stated that Mobley called Woods and attempted to call her Atlanta source at TT#4. Whether Mobley made one or multiple failed attempts to call her source are immaterial points. These differences do not meet the Defendant's burden. In fact, all of this supports the Affidavit's conclusions: namely, that Mobley initially

25

provided a false number for her supplier and was ultimately unsuccessful in contacting him with agents.[7]

Even if relevant material was intentionally excluded, and it was not, the Defense must show that the excluded information affected the probable cause analysis. The Defendant claims that the Affiant made these decisions to "mislead the magistrate [sic] into thinking that Ms. Mobley identified Mr. Dunn as her source when there is no evidence she did so." (Doc. 719 at 11; *see also id.* at 14 ("No record has been provided to show that [Mobley] used the name "Silk" or Dunn at any time."). This argument is illogical, as even the Defendant's own motion acknowledges that the "affidavit does not even claim that Mobley identified Charles Dunn as her source." (*Id.* at 12). Indeed, the Affidavit does not include any claims that Mobley identified the Defendant. In short, the Defendant has not made a substantial preliminary showing of a knowing and intentional (or with reckless disregard of the truth) false statement or omission.

**B. The affidavit's statement that the Defendant's TT#4 was in contact with Mobley on the day of the traffic stop is supported by the evidence.**

On September 28, 2022, the Defendant phoned Mobley before, during, and after the traffic stop, as reflected on both Mobley's and the Defendant's toll records. The Defense alleges that the records do not show the Defendant called Mobley during the traffic stop (Doc. 719 at 12-13), but that claim is mistaken.

---

[7] This conclusion was also unsurprising in light of the fact that after Mobley was released from police custody, she "failed to cooperate any further with law enforcement" and was still in contact with the Defendant. (Ex. A at 62).

During the traffic stop, the Affidavit lists seven outgoing calls from the Defendant's TT#4 to Mobley between 4:10 pm and 5:21 pm. (Ex. A at 40-41). In his affidavit, the Affiant explained that the "[t]oll records show[ed] multiple communications from the Defendant to Mobley during [the traffic stop], which [was] consistent with the Defendant attempting to contact Mobley numerous times and being concerned about the cocaine." (Ex. A at 40). The Defendant inaccurately claims that these calls are not reflected in Mobley's phone records, which the Defendant instead claims show Mobley making outgoing calls. (Doc. 719 at 13).

In fact, Mobley's toll records show incoming, unanswered phone calls that were forwarded to voicemail. Specifically, Mobley's toll records show several outgoing phone calls to phone number (360) 842-9999. (See Exhibit B at 178-79). However, outgoing calls to this -9999 number do **not** represent calls out to another customer. (Exhibit E – Affidavit from T-Mobile Custodian Susan Johnson). Rather, phone records showing outgoing phone calls to this number, like Mobley's, represent **incoming** calls that were forwarded to T-Mobile's voicemail system. (Exhibit E).

This matches the information from the Defendant's toll records,[8] which show multiple calls to Mobley during this period, including calls at 4:10 pm (twice), 4:11 pm, 4:15 pm (twice), 5:20 pm, and 5:21 pm[9]. (Exhibit C at 93-94—Excerpt of

---

[8] The Government produced the Defendant's toll records on August 20, 2025.

[9] The Defendant's records were produced in Coordinate Universal Time (UTC).

TT#4 Toll Records). With that said, Mobley's toll records match the Defendant's toll records. Mobley's toll records show several incoming calls that were forwarded to voicemail, including calls at 4:10 pm (twice), 4:11 pm, 4:15 pm (twice), 5:20 pm, and 5:21 pm. Consistent with the affidavit, Mobley's toll records also show incoming phone calls from the Defendant's TT#4 throughout the day of the traffic stop. Besides the seven missed calls from the Defendant during the traffic stop, the Defendant's TT#4 called Mobley at 9:24 am, 7:27 pm, 7:28 pm, and 7:31 pm. (Exhibit B at 179). In sum, these calls by the Defendant support the affidavit's statements that the Defendant was constantly checking on Mobley before, during, and after the traffic stop.

### 3. The Title III applications were authorized by an appropriate individual.

On March 12, 2021, United States Attorney General Merrick Garland specially designated persons serving as a Deputy Assistant Attorney General in the Criminal Division as a person empowered under Title 18, United States Code, 2516(1) to authorize wiretap applications. Title III of the Omniums Crime Control and Safe Streets Act of 1968 delineates who may authorize an application for a wiretap. *See* 18 U.S.C. § 2516(1). It states, in relevant part,

> The Attorney General, Deputy Attorney General, Associate Attorney General, or any Assistant Attorney General, any acting Assistant Attorney General, or any Deputy Assistant Attorney General or acting Deputy Assistant Attorney General in the Criminal Division or National Security Division specially designated by the Attorney General, may authorize an application to a Federal judge of competent jurisdiction for, and

> such judge may grant in conformity with section 2518 of this
> chapter an order authorizing or approving the interception of
> wire or oral communications…

18 U.S.C. § 2516(1). Each of the Title III applications at issue in this case include a

March 12, 2021 order from the Office of the Attorney General ("Attorney General

Order No. 5000-2021"), signed by United States Attorney General Merrick

Garland, who was Attorney General at all relevant times for these applications.[10]

In the order, Attorney General Garland specially designated "…any Deputy

Assistant Attorney General of the Criminal Division" "to exercise the power

conferred by Section 2516(1) of Title 18, United States Code, to authorize

[wiretap] applications." (Exhibit G at 17 – February 2023 Application for Wire

and Electronic Interception; Exhibit H at 18 – April 2023 Application for Wire and

Electronic Interception; Exhibit M at 18 – June 2023 Application for Wire and

Electronic Interception). The applications also include a memorandum, signed by

a Deputy Assistant Attorney General ("DAAG") in the Criminal Division,

authorizing the application. ( Exhibit G at 18; Exhibit H at 19; Exhibit K at 19). In

the orders authorizing the application, the district court found the applications

were authorized by "a duly designated official of the Criminal Division, United

States Department of Justice, who has been specially designated by the Attorney

General of the United States, pursuant to Order Number 5000-2021, dated March

12, 2021, to exercise the power conferred on that official by Section 2516 of Title

18, United States Code…" (Exhibit F at 6; Exhibit J at 7 – April 2023 Order for

---

[10] Merrick Garland served as United States Attorney General from March 11,
2021, through January 16, 2025.

Wire and Electronic Interception; Exhibit N at 7 – June 2023 Order for Wire and Electronic Interception).

The Defendant alleges "the authorization is invalid because it is a blanket authorization that fails to comply with the statute's limitation that lower-level DOJ officials be 'specially designated by the Attorney General'" and because the authorization "is unrestricted as to time."  (Doc. 719 at 4, 5). The Eleventh Circuit has previously rejected a similar claim about the length of the effect of the authorization. *See United States v. Messersmith*, 692 F.2d 1315, 1317 (11th Cir. 1982) (holding official was properly designated even after Attorney General left office because "act of an administrative official continues in effect until it is revoked"); *see also United States v. Wyder*, 674 F.2d 224 at 227 (4th Cir. 1982) ("The acts of administrative officials continue in effect after the end of their tenures until revoked or altered by their successors in office.  Any other general rule would impose an undue burden on the administrative process.").

The statute simply requires that the Attorney General specially designate one of the specified officials listed in Section 2616(1), not that the Attorney General identify such persons by name.  While the Eleventh Circuit has not yet addressed the specific question concerning whether the Attorney General may designate lower-level officials by job title, other circuits and one other district judge in this Court have found that the statute does not require designation of specific officials by name. *See e.g., United States v. Pellicci*, 504 F.2d 1106, 1107 (1st Cir. 1974) ("[T]he designation of a single person accomplished by job title rather than by name does not run afoul of the legislative intent . . . that the authority to

approve applications be both narrowly confined and limited to those responsive to the political process.") (internal citation omitted); *United States v. Lambert*, 771 F.2d 83, 90 (6th Cir. 1985) (same and specifying that "This designation will then apply to whomever holds this office in the future."); *United States v. Torres*, 908 F.2d 1417, 1421 (9th Cir. 1990) (same)); *United States v. Villanueva- Ros*, case no. 1:20-cr-73-MHC-CMS, 2021 WL 3509555, at *3 (N.D. Ga, Aug. 10, 2021) (rejecting argument that statute requires designation by name as opposed to job title). This Court should follow the persuasive reasoning of these other opinions. Indeed, the Defendant's motion offers no reason to depart from this sound logic.

---

The wiretap applications at issue in this case contains a valid order from the Attorney General specially designating individuals serving as a Deputy Assistant Attorney General in the Criminal Division as a person empowered under Title 18, United States Code, 2516(1) to authorize wiretap applications. The application also included signed memorandums from a Deputy Assistant Attorney General in the Criminal Division authorizing the request for a wiretap. Accordingly, the Defendant's motion to suppress the wiretap based on failure to comply with Section 2516(1) should be denied.

## 4. The April 2023 wiretap recordings were properly sealed.

The April 2023 wiretaps were sealed immediately as legally required. The statutes requires that, "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." 18 U.S.C. § 2518(8)(a). The

Eleventh Circuit has held that recordings are sealed "immediately" if they are sealed one or two days after the wiretap order expires. *United States v. Stowers*, 32 F.4th 1054, 1064 (11th Cir. 2022). The only requirements for sealing are that the recordings be made available to the judge. (*Id.*). ("Other than gathering the tapes, putting them in boxes and taking the tapes to the supervising judge," there are "no other necessary steps to sealing." *quoting United States v. Carson*, 969 F.2d 1480, 1489 (3d Cir. 1992)).

Here interception of the Defendant's TT#3 began on or about April 7, 2023, and ended on or about May 6, 2023. (Exhibit K at 3 – Application to Seal TT#3). On May 8, 2023, the wiretap recordings were downloaded onto a disc, placed in a secure envelope, and made available to the issuing judge. (Exhibit L—May 8, 2023, email to issuing judge). On May 9, 2023, the issuing judge signed the order sealing the wiretap recording). (Exhibit K at 7). Because the wiretap recordings were made available to the issuing judge two days (May 8, 2023) after the recordings ceased on May 6, 2023, the recordings were properly sealed in compliance with the statute.

**5. The affidavit complied with the necessity requirements in Title III**

The February 2023 affidavit complied with necessity requirements as Affiant thoroughly detailed the investigative techniques tried or considered before he sought approval to intercept communications. Federal law requires applications for wiretap authority to include a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18

U.S.C. § 2518(1)(c).  Similarly, the court authorizing the wiretap must find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(3)(c). Here, over more than forty pages, the Affidavit spelled out why normal investigative procedures were insufficient to accomplish the goals and objectives of the investigation.

The government's "burden of showing 'necessity' is not high." *United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991); *United States v. Smith*, 31 F.3d 1294, 1297 (4th Cir. 1994) ("the burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion,' that does not 'hamper unduly the investigative powers of law enforcement agents.'").  Further, the necessity requirement "is not tantamount to an exhaustion requirement."  *United States v. Lopez*, 300 F.3d 46, 52-53 (1st Cir. 2002).  To comply with the necessity requirement, the affidavit does not need to provide a "comprehensive exhaustion of all possible techniques but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves." *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986).  The purpose of the necessity requirement "is not to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted, but simply to inform the issuing judge of the difficulties involved in the use of

conventional techniques." *United States v. de la Fuente*, 548 F.2d 528, 538 (5th Cir. 1977).

Further, "[t]he partial success of alternative investigative measures . . . does not necessarily render electronic surveillance unnecessary." *United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011). Instead, the Government must make a showing as to "why alternative measures are inadequate for 'this particular investigation.'" (*Id.*) (quoting *United States v. Carrazana*, 921 F.2d 1557, 1565 (11th Cir. 1991)). Nor does the mere availability of some traditional law enforcement techniques foreclose the use of wiretaps. *See United States v. Smith*, 893 F.2d 1573, 1589 (9th Cir. 1990) (noting that wiretaps "need not be the last resort"). Instead, "the effectiveness of traditional investigative techniques must be judged in light of the goals of the investigation and not based on whether one or more of the conspiracy participants can be successfully prosecuted." *United States v. Acosta*, 807 F. Supp. 2d 1154, 1239 (N.D. Ga. June 2011).

Accordingly, the government need only present specific factual information sufficient to establish that it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence to the point where wiretapping becomes reasonable given the statutory preference for less intrusive techniques. *Smith*, 31 F.3d at 1298. Thus, the necessity requirement does not require the government to show an absolute impasse in the investigation. Rather, the affidavit "is adequate if it satisfies the burden that it indicates a 'reasonable likelihood' that alternative techniques would fail to expose the crime." *United States v. Ashley*, 876 F.2d 1069, 1073 (1st Cir. 1989) (internal quotations omitted).

34

In making the necessity determination, courts must read the supporting affidavit "in a practical and common-sense fashion." *United States v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984) (internal quotations omitted). The district court's determination is a finding of fact that will not be reversed unless "clearly erroneous." *United States v. Weber*, 808 F.2d 1422, 1424 (11th Cir. 1987). And the judge to whom the application is made "is clothed with broad discretion in its consideration of the application." *Alonso*, 740 F.2d at 868-69.

Here, the affidavit summarized the information learned about the Defendant and Macedo during the investigation, including phones used, locations of homes and cars, businesses owned, suspected drug customers, and locations of suspected drug meetings. (Ex. A at 47-50). The affidavit also detailed prior investigations into the Defendant, Macedo, and other drug traffickers like Royce Cobb and Timothy Woods. (Ex. A at 50-54). While these efforts helped the investigation, they were insufficient to meet the investigation's goals. The Defendant alleges that telephonic surveillance was unnecessary because agents were gathering large amounts of information through traditional methods. (Doc. 719 at 22). This misstates the government's burden. Indeed, the agents obtained information through traditional means such as remote surveillance, geo-location data of cellular devices, physical surveillance, administrative and grand jury subpoenas, utilization of confidential informants and checks of law enforcement police indices. (Ex. A at 47). But these investigative techniques failed to fully achieve the investigation's goals and objectives—namely the dismantling of this drug trafficking organization. (Ex. A at 43).

35

While the overarching investigatory goal was to dismantle the DTO and to disrupt narcotics distribution, the DEA laid out specific investigatory goals in the affidavit, which included, among other things:

· Revealing the nature, extent, and methods of operation of the Defendant, Macedo and other organization members;

· Revealing the roles of all targets, accomplices, aiders and abettors;

· Determining the locations the organization used to store drugs and drug proceeds;

· Identifying the drug suppliers for Macedo and determine locations of drug stash houses;

· Learning about the organization's hierarchy;

· Learning about the customer base and fully identify major customers;

· Locating items and records used to further unlawful activities, including other cell phones;

· Identifying money launderers employed by the Defendant and Macedo;

· Understanding the transportation component from international domains to domestic; and

· Gathering evidence necessary to prosecute and convict the targets of the investigation.

(Ex. A at 9-11).

The affidavit catalogued each of the traditional techniques used to further the goals of the investigation but also explained how each method was insufficient to reach the stated goals and objectives. For instance, using grand jury subpoenas, agents identified the Defendant's residence and locations of his businesses. (Ex. A at 49). However, the grand jury subpoenas were of limited value as they could

only corroborate historical facts and not be used to identify the DTMLO's leadership structure. (Ex. A at 65).

The affidavit discussed agents' success with confidential informants/sources, but were unable to proactively use these confidential informants to contact the targets without jeopardizing the clandestine nature of the investigation. (Ex. A at 56). Agents used one confidential informant to contact Macedo about collecting a drug debt, however, when the informant tried to resume communications, Macedo blocked his calls. (Ex. A at 94). Affiant also explained the problem of introducing a confidential source or undercover agent to this DTO. Specifically, the Defendant and Macedo only conducted drug trafficking activities with trusted associates. (Ex. A at 61). Considering how this organization operated, Affiant believed that the introduction of an unknown confidential informant could jeopardize the investigation and cause the DTO to hide or destroy evidence or change communication methods. (Ex. A at 61).

The affidavit also discussed the difficulty with physical surveillance. Specifically, because the Defendant resided in a cul-de-sac and the flow of traffic was minimal there, agents risked being recognized. (Ex. A at 72-73). Agents faced similar hurdles surveilling the Defendant's warehouse. The warehouse was surrounded by a fence and located at the end of a dead-end roadway. (Ex. A at 73). Surveillance was obstructed by the fence, preventing agents from gathering meaningful details regarding events inside the warehouse. (Ex. A at 73). Agents attempted to surveil Macedo at the Defendant's residence, but Macedo left as agents arrived. (Ex. A at 73). Agents discussed the limitations of physical

surveillance in that it did not allow them to determine the significance of locations and purposes of meetings. (Ex. A at 73). At any rate, Affiant explained that physical surveillance alone would not help agents ascertain the purpose of the meetings nor the significance of the locations used by the DTO. (Ex. A at 73).

The affidavit explained the difficulty and limitations of electronic tracking and geolocation data in this case. Although agents obtained a tracker for Macedo's vehicle, they were unable to install the tracker as Macedo lived on eight acres of land and had a long driveway. (Ex. A at 75). Additionally, a tracker on Macedo's vehicle would produce minimal results as Macedo drove five different vehicles. (Ex. A at 75). Agents obtained geo-location data for the Defendant's phones which routinely placed the phones near the Defendant's residence in Fayetteville, Georgia. (Ex. A at 49). Agents obtained geo-location data for Macedo's phones, which routinely placed the phones near Macedo's residence in Loganville, Georgia. (Ex. A at 71). Once, geo-location data showed Macedo's phone near the Defendant's residence in Fayetteville, Georgia. (Ex. A at 72-73). Affiant believed that further tracking of the Defendant's phones would be fruitless as unlike Macedo, the Defendant, was never observed conducting suspected narcotics transactions in places other than  at his warehouse and residence. (Ex. A at 78-79).

Affiant considered against obtaining a search warrant for residences, but agents were unsure whether narcotics would be found on the residences. (Ex. A at 83). Nevertheless, Affiant believed that executing search warrants prematurely, would compromise the investigation and alert other targets. (Ex. A

at 84). Accordingly, Affiant believed that intercepting the telephones would assist in documenting and establishing probable cause to search locations. (Ex. A at 85).

Affiant discussed the limitations of tools such as pole camera surveillance and trash pulls. Specifically, although pole camera surveillance allows agents to observe activity around locations, agents are unable to hear conversations between DTO members and associates. (Ex. A at 80). Additionally, agents attempted to install a pole camera outside the Defendant's residence, but were unsuccessful as the power lines were buried. (Ex. A at 80-81). In any event, pole camera surveillance could not determine why meetings occurred nor determine when future meetings would take place. (Ex. A at 81-82).

Agents considered and rejected the idea of trash pulls at the Defendant's residence because of the difficulty in conducting trash pulls in a residential area where the roadway was one directional. (Ex. A at 82). And agents could not access the Defendant's trash at the warehouse as it was gated. (Ex. A at 82).

The affidavit not only articulated the success and failures of each investigative technique, but it also linked the investigative techniques to the goals of the investigation. Embedded in the investigative tools analysis, were reasons explaining why the particular investigative technique was insufficient to meet the goals of the investigation.

To challenge necessity, the Defendant relies on a Ninth Circuit case. *United States v. Blackmon*, 273 F.3d 1204 (9th Cir. 2001). In *Blackmon*, the court suppressed a wiretap finding that the application failed to make a particularized showing of

necessity. *United States v. Blackmon*, 273 F.3d 1204, 1206 (9th Cir. 2001). There, the concluded the necessity section was a "carbon copy" of a different application and contained "material misstatements and omissions." (*Id.* at 1208). Specifically, in *Blackmon*, the necessity section mentioned the use of physical surveillance and informants towards the defendant, when those techniques had not been employed against the defendant as alleged. (*Id.*). Additionally, in *Blackmon*, the necessity section was not tailored to that investigation and instead was a duplicate of a prior wiretap application. (*Id.*). Because the errors in *Blackmon* did not occur here, we can comfortably distinguish *Blackmon* from the instant case.

In contrast, necessity here resembles necessity from a recent case decided in this district. (*see Brandt*, 2025 WL 1833186 (N.D. Ga. June 13, 2025). In *Brandt*, the necessity section described the success experienced with traditional techniques by outlining the evidence collected but also described in detail the limitations of the investigative techniques, in light of the investigation's goals. *Brandt*, 2025 WL 1833186, at *28. The Court found this recitation met the necessity requirement for a wiretap affidavit, and "[t]he fact that the traditional methods in use were producing evidence [did] not alter [the Court's] conclusion." (*Id.*). Like, *Brandt*, the affidavit here outlined the evidence collected but also outlined the inadequacies of traditional techniques. Even if agents had sufficient information to prosecute one of the targets, that would not foreclose telephonic surveillance especially if the evidence did not suffice to accomplish the investigation's goals—the dismantling of the entire drug trafficking organization. In sum, the affidavit showed a need for wiretap evidence because it presented specific factual

40

information, which established the difficulties encountered in penetrating the criminal enterprise or in gathering evidence to the point where wiretapping became reasonable.

## 6. Suppression is not warranted because of the *Leon* good faith exception to the exclusionary rule.

Even assuming that the wiretap orders for the Defendant's phones (TT#3 and TT#4) were invalid because of a defect in probable cause or necessity, the seized communications should not be suppressed under the good faith exception to the exclusionary rule. *United States v. Goldstein*, 989 F.3d 1178, 1196-97 (11th Cir. 2021). The Supreme Court established the good faith exception to the exclusionary rule to prevent suppression of the items found pursuant to a search warrant. Under *United States v. Leon*, 468 U.S. 897 (1984), the good faith exception to the exclusionary rule for Fourth Amendment violations keeps evidence from being suppressed when law enforcement officers obtained it through objective good faith reliance on a facially valid warrant that is later found to lack probable cause. *Id*. at 913; *see also United States v. Glinton*, 154 F.3d 1245, 1256-57 (11th Cir. 1998). Nevertheless, "it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 922–23. For instance, *Leon* good faith is inapplicable where the supporting affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable. *See United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003). The Government bears the burden of demonstrating the applicability of the *Leon* good faith exception. *See id.* at 1297.

The Leon good faith exception applies here as the affidavit detailed the Defendant's phones routine connections to drug traffickers and drug couriers. Specifically, the Defendant's TT#4 repeated contacts to Mobley during her traffic stop with cocaine and continued communication with Mobley leading up to the days of wire approval. Additionally, the Defendant matched the description Mobley provided of her Atlanta drug source. Similarly, the Defendant's TT#3 was repeatedly in contact with drug trafficker Macedo especially as Macedo traveled to the Defendant's warehouse. Macedo told a confidential informant that he needed to contact a drug associate to collect a drug debt and Macedo immediately called the Defendant's TT#3. Defendant's TT#3 was also in constant communication with drug trafficker Timothy Woods. Additionally, the affidavit also listed the Defendant's prior criminal activity, including his participation in drug trafficking and money laundering less than two years before the date of wire authorization. This information far exceeds the type of "bare-bone statement of nothing more than conclusionary allegations" that would negate *Leon* good faith. *See Glinton*, 154 F.3d at 1257. Accordingly, it cannot be said that the affidavit was so lacking in probable cause as to render belief unreasonable.

## Conclusion

For all the reasons stated above, the Government respectfully requests that this Court deny the Defendant's motion.

Respectfully submitted,

THEODORE S. HERTZBERG
*United States Attorney*

/s/JOHN T. DEGENOVA
*Assistant United States Attorney*
Georgia Bar No. 940689
John.DeGenova@usdoj.gov

/s/DWAYNE A. BROWN JR.
*Assistant United States Attorney*
Georgia Bar No. 509554
Dwayne.brown@usdoj.gov

600 U.S. Courthouse,
75 Ted Turner Drive S.W.,
Atlanta, GA 30303
(404) 581-6000